## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CHARLES RASHID MALIK LEE,<br><br>Defendant. | Case No. 3:21-cr-00117-TMB-SAO<br><br>ORDER ON DEFENDANT'S MOTION FOR NEW TRIAL AND MOTION TO DISMISS INDICTMENT<br>(DKT. 205) |

## I.    INTRODUCTION

Before the Court is Defendant Charles Rashid Malik Lee's Motion for New Trial and Motion to Dismiss Indictment (the "Motion").[1] In the Motion, Lee seeks a new trial under Federal Rule of Criminal Procedure ("Rule") 33 and also requests the Court dismiss the indictment against him with prejudice.[2] The United States of America (the "Government") opposes the Motion.[3] Because the evidence in this case does not preponderate sufficiently heavily against the verdict such that a serious miscarriage of justice may have occurred to warrant a new trial, the Court **DENIES** the Motion as set forth below.

## II.    BACKGROUND

### A.  Factual Background

On October 5, 2021, a search warrant was issued authorizing the search of Lee's Anchorage residence, located at 6711 East 10th Avenue (the "Subject Residence"), and Lee's 2015 Chevrolet

---

[1] Dkt. 205 (Motion).

[2] *See generally id.*

[3] Dkt. 206 (Opposition).

Case 3:21-cr-00117-TMB-SAO   Document 211   Filed 08/17/23   Page 1 of 28

Tahoe (the "Subject Vehicle").[4] In support of the search warrant, Federal Bureau of Investigation ("FBI") Special Agent ("SA") Katherine Nelson submitted an affidavit, in which she described (1) her experience and knowledge as an FBI Special Agent,[5] (2) her knowledge of the common methods and behaviors of narcotics traffickers,[6] and (3) the surveillance and investigation of Lee, and (4) law enforcement's determinations of probable cause underlying the search warrant.[7]

On October 12, 2021, law enforcement executed the search warrant on the Subject Residence and Subject Vehicle, recovering: (1) 50 grams or more of pure methamphetamine; (2) 100 grams or more of a mixture and substance containing a detectible amount of heroin; (3) a mixture and substance containing a detectable amount of cocaine; (4) a Glock 30 .45 caliber semiautomatic pistol; and (5) a Ruger 9mm semiautomatic pistol.[8]

B. *Procedural Background*

On December 15, 2021, Lee was charged by indictment with: Possession of Controlled Substances with Intent to Distribute (Count 1);[9] Possession of Firearms in Furtherance of Drug Trafficking Crime (Count 2);[10] and Felon in Possession of Firearms and Ammunition (Count 3).[11] On March 31, 2022—a year and a half before trial—the Government provided Lee with "numerous video files containing aerial surveillance footage depicting flyovers of [Lee's] residence" taken on

---

[4] Dkt. 23 at 1–7 (Sealed Search Warrant).

[5] *Id.* at 9.

[6] *Id.* at 9–17.

[7] *Id.* at 17–33.

[8] *See, e.g.*, Dkt. 2 at 2 (Indictment).

[9] *Id.* at 2; *see* 21 U.S.C. § 841(a)(1), (b)(1)(A)–(B).

[10] Dkt. 2 at 2; *see* 18 U.S.C. § 924(c)(1)(A)(i).

[11] Dkt. 2 at 3; *see* 18 U.S.C. §§ 922(g)(1), 924(a)(2). The indictment also included two forfeiture allegations. Dkt. 2 at 4–5.

various occasions in September and October 2021.[12] On July 14, 2023, three days before Lee's trial was set to begin, law enforcement again provided the Government with two additional videos, taken on August 31, 2021, of aerial surveillance of another surveillance target, Robert Miller, and Lee.[13] On July 16, 2023, the day before trial, the Government reviewed the footage during trial preparation and produced it to Lee. The footage was "timestamp[ed] for the portions of the footage capturing [Lee's] movements" and was approximately one hour and seven minutes long.[14] The Government clarifies that it was not aware of, nor had it reviewed, this specific aerial footage until July 16, 2023.[15]

It was not until the first afternoon of trial, during a sidebar conversation with counsel, that the Court learned of this late disclosure.[16] Upon learning this information, the Court dismissed the jury early and directed counsel to take the afternoon and evening to review the footage.[17]

On the following day, at a hearing outside the presence of the jury, Lee moved for a mistrial based on the Government's late disclosure. In his oral motion, Lee contended that he should have had access to this additional aerial footage before the Court considered his motions to suppress.[18] The Court then directed the parties to file simultaneous briefing on the issue due later that day.[19]

---

[12] *See* Dkt. 206 at 5; Dkt. 175 at 4–5 (Opposition to Motion to Suppress at Docket 171).

[13] Dkt. 161 at 13 (Trial Day 2, July 16, 2023, Partial Transcript); *see* Dkt. 208 (Notice of Filing CD Conventionally); Exhibit 116 (Aerial Surveillance Footage I); Exhibit 117 (Aerial Surveillance Footage II).

[14] Dkt. 206 at 6.

[15] Dkt. 161 at 13.

[16] *See* Dkt. 160 (Trial Day 1, July 17, 2023, Partial Transcript of Sidebar).

[17] *Id.*

[18] Dkt. 178 at 132–46 (Trial Day 2, July 18, 2023, Transcript); *see* Dkt. 179 (Notice of Incomplete Discovery).

[19] Dkt. 178 at 142, 145–46.

In Lee's subsequent supplemental briefing, he included an additional, alternative request for a trial continuance pursuant to Rule 16.[20]

The Government opposed Lee's motion for a mistrial on two grounds, contending that: (1) Lee failed to seize his opportunity to move for a continuance before trial and (2) Lee's rights were not prejudiced by not having access to this additional aerial footage before the November 2022 *Franks* evidentiary hearing.[21]

After review of the aerial footage and the briefing, the Court held a motion hearing. There, Lee contended that the absence of the additional aerial footage prior to the November 2022 *Franks* hearing prejudiced his overall defense strategy and inhibited his ability to mount a defense, asserting that this footage "would [have helped] him" with his suppression motions.[22] In opposition, the Government stated that it provided the additional aerial footage to defense counsel as soon as possible after reviewing it.[23] The Government also contended that (1) the footage in question was outside the scope of the November 2022 *Franks* inquiry and (2) the contents of the footage were not exculpatory.[24]

---

[20] *See* Dkt. 156 (Motion for Continuance). At the 4:30 p.m. motion hearing, Lee stated that, although his briefing on the matter was not clear, he was seeking both forms of relief—a mistrial *or* a continuance—from the Court. *See* Dkt. 161 at 14–15.

[21] *See Franks v. Delaware*, 438 U.S. 154 (1978); Dkt. 155 (Memorandum Opposing Mistrial); Dkt. 156.

[22] *See* Dkt. 161 at 18–20. Lee also suggested that the aerial footage may be edited, which the Government denies. The record, however, does not reflect that the aerial footage has been edited and, without further evidence, the Court did not take this allegation into consideration. *See, e.g.*, *id.* at 17.

[23] Dkt. 178 at 147–48.

[24] *See, e.g.*, *id.* at 162–63; Dkt. 166 at 2 (Memorandum in Advance of Franks Hearing).

After considering the parties' positions, the Court denied Lee's motion for mistrial, finding that the delayed disclosure of the additional aerial footage did not constitute a *Brady*[25] violation because Lee had not (1) demonstrated how the footage would have been material to the outcome of his case or (2) articulated a way in which the late disclosure may have prejudiced him. As a result, the Court declined to grant Lee's motion for a mistrial, reasoning that although "a trial can be discontinued when particular circumstances manifest a necessity for so doing, and when failure to discontinue would defeat the ends of justice," in this case Lee had not met that "manifest necessity" threshold.[26] Still, in an abundance of caution, the Court offered Lee the opportunity to re-open the *Franks* inquiry and re-examine SA Nelson, granted a trial continuance, and prohibited the Government from referencing the aerial footage in its case-in-chief.[27]

On July 20, 2023, the Court re-opened the *Franks* inquiry and held an evidentiary hearing where the parties questioned SA Nelson regarding the additional aerial surveillance of Lee.[28] At the end of the hearing, the Court set a supplemental briefing deadline; Lee then filed two motions: (1) a Motion to Suppress and (2) a Motion to Reopen Deadlines.[29] In those motions, Lee claimed that the Government's delayed disclosure violated his Fourth Amendment and Sixth Amendment rights, and that law enforcement committed a new *Franks* violation.

The Government opposed and the Court denied both motions on the merits.[30] Specifically, the Court denied Lee's renewed request for suppression based on a *Franks* violation because there

---

[25] *Brady v. Maryland*, 373 U.S. 83 (1963).

[26] Dkt. 163 at 5–8 (Order on Motion for Continuance).

[27] *Id.* at 7–8.

[28] The hearing was held outside the presence of the jury. Dkt. 165 (Text Order); Dkt. 169 (Trial Day 4, July 19, 2023, Transcript); Dkt. 170 (Minute Entry).

[29] Dkt. 171 (Motion to Suppress); Dkt. 172 (Motion to Reopen Deadlines).

[30] Dkt. 175; Dkt. 186 (Order Denying Motions).

5

was no evidence that SA Nelson relied on any aerial surveillance footage when drafting the affidavit; the Court also found that there was no indication that the aerial footage violated Lee's Fourth or Sixth Amendment rights.[31] Consequently, the Court also denied Lee's motion to re-open another motion to suppress briefing schedule.[32] After a four-day continuance, the trial recommenced on July 24, 2023.[33] On July 25, the jury returned a verdict of Guilty on all three counts.[34]

### C. The Motion for New Trial and Dismissal of the Indictment

In the Motion before the Court, Lee seeks a new trial and dismissal of his indictment with prejudice.[35] Lee argues that (1) the "interest of justice" requires he be granted a new trial because "he was convicted based on evidence not validly before the jury" and (2) the Court "must [also] dismiss the indictment to preserve judicial integrity" and "deter future illegal conduct by the [G]overnment."[36]

The Government opposes, contending that the delayed disclosure of the additional aerial footage does not warrant a new trial because the footage does not establish that SA Nelson, or any

---

[31] *See generally* Dkt. 186.

[32] The Court construed Lee's motion to reopen deadlines as a motion to reconsider the Court's Order at Docket 163. *See id.* at 19–22.

[33] Dkt. 180 (Text Order).

[34] Lee's case was trifurcated into three phases. In the first phase of trial, the jury considered Count 1 and Count 2. Upon reaching a guilty verdict on both counts, the Court instructed the jury to return to deliberations to consider Count 3. Once the jury reached its verdict on Count 3, the Court then asked the jury to consider two criminal forfeiture allegations. *See* Dkt. 203 (Jury Verdicts on Counts 1–3); Dkt. 204 (Jury Verdicts on Forfeiture); *see, e.g.*, Dkt. 2 at 1–2. After the jury returned a verdict on Counts 1 and 2, but before the Jury reconvened to deliberate on Count 3, Lee filed another Motion to Dismiss, which the Court denied as untimely. *See* Dkt. 187 (Motion to Dismiss); Dkt. 189 (Amended Motion to Dismiss); Dkt. 196 (Text Order). Both the motion and amended motion were filed after the jury returned its verdicts on Counts 1 and 2.

[35] *See* Dkt. 205.

[36] *Id.* at 1, 5.

other law enforcement officer that participated in the August 2021 surveillance of Lee, deliberately or recklessly made false statements in support of the search warrant at issue. Further, the Government asserts that the Motion should also be denied because the Court's trial continuance cured any prejudice to Lee and the interest of justice "does not require vacating [Lee's] conviction."[37]

## III.     FACTS

### A.     The Search Warrant Affidavit

In the search warrant affidavit, SA Nelson outlines her participation in the drug trafficking investigation of Donald McGranahan, Josiah Voss, and Miller, which ultimately led law enforcement to identify Lee as a likely drug trafficking participant.[38] SA Nelson begins the affidavit by describing the explicit and coded exchanges regarding the trafficking of narcotics between surveillance targets McGranahan and Voss.[39] For example, the affidavit recounts that law enforcement intercepted a communication from McGranahan in which he specifically requested that Voss's drug supply be "good and no fentanyl," to which Voss replied that he would charge "13 for 10."[40]

SA Nelson then provides information connecting McGranahan's and Voss's activities with Miller. First, the affidavit states that on May 23, 2021, law enforcement intercepted McGranahan's instructions to Voss to purchase ten ounces of heroin; after this directive, at about 3:13 p.m., Voss placed a short call to "TT-3," a cell phone registered to Miller.[41] A few minutes after the call to TT-

---

[37] Dkt. 206 at 1–2.

[38] Dkt. 23 at 17–28.

[39] *Id.* at 18–23.

[40] *Id.* at 18.

[41] *Id.* at 18–19.

3, Voss called McGranahan and "advised that he had just spoken with his supplier" and that the supplier was "ready for ten if you want to do it."[42]

Later that day, at approximately 7:57 p.m., McGranahan again contacted Voss to arrange for the purchase of methamphetamine and cocaine.[43] SA Nelson stated that McGranahan and Voss used the words "powder" and "windows" which are "commonly used slang terms" for cocaine and methamphetamine.[44] Immediately following this call, Voss called TT-3, with the call lasting just under a minute.[45] On that same day, at approximately 9:27 p.m., Voss placed another call to TT-3. Then, at 9:52 p.m., McGranahan called Voss, inquiring as to the status of Voss's source of drug supply.[46] Voss replied that his source "said he was on his way about 20 minutes ago."[47] Phone records from that night reflect that Voss made calls exclusively to TT-3 and McGranahan.[48]

On both May 24 and May 26, 2021, this pattern of communication between Voss, McGranahan, and TT-3 continued: Voss and McGranahan discussed the purchase of drugs and Voss placed short calls to TT-3 following these conversations.[49] SA Nelson concludes that, based on her training and experience, these series of calls on May 23, 24, and 26, 2021, meant that "McGranahan was contacting Voss to arrange the purchase of narcotics" and that Voss was then contacting his source, believed to be Miller, on calls made to TT-3.[50]

---

[42] *Id.*

[43] *Id.* at 19.

[44] *Id.*

[45] *Id.*

[46] *Id.* at 20.

[47] *Id.*

[48] *Id.*

[49] *Id.* at 20–21.

[50] *Id.* at 20–23.

8

The affidavit then offers the grounds for the probable cause linking Miller's drug activities to Lee, stating that on August 19, 2021, investigators intercepted electronic communications between Miller and a telephone number associated with Lee. This led law enforcement to believe that Lee was contacting Miller to arrange a narcotics transaction based on the subsequent surveillance of Lee's actions.[51] After intercepting the communications between Miller and Lee, law enforcement observed Miller leave his residence and drive to an Arby's parking lot. There, Miller parked, exited his vehicle, and got into the passenger seat of the Subject Vehicle driven by Lee. According to the affidavit, Lee drove through the Arby's drive-thru with Miller and eventually returned to Miller's parked car. Surveillance then observed Miller exit the Subject Vehicle, walk to his car, grab a bag from it, and return to the Subject Vehicle, giving Lee the bag.[52] In the affidavit, SA Nelson asserts that, based on her training and experience, this activity is consistent with narcotics trafficking; in the drive-thru Lee and Miller likely confirmed the price and amount of drugs to be sold, and Miller subsequently gave these drugs to Lee in the bag.[53]

After this exchange, surveillance followed Lee to a Walmart parking lot and observed him load shopping bags into the Subject Vehicle with "an unknown female."[54] Eventually, Lee returned to the Subject Residence and then continued driving to a Walgreens parking lot. There, Lee parked the Subject Vehicle, exited, and entered a nearby Dodge pickup truck through the front passenger door. Law enforcement then "observed the unknown male driver of the [truck] hunched over the middle console with Lee."[55] A short time later, Lee exited the truck and drove the Subject Vehicle

---

[51] *Id.* at 25–28.

[52] *Id.* at 26.

[53] *Id.*

[54] *Id.* at 27.

[55] *Id.*

back to the Subject Residence.[56] SA Nelson explains that, based on her "training and experience, it is common during narcotics transactions for the parties to weigh and confirm the amounts being purchased prior to completing the transaction, which is consistent with what was observed."[57]

During the mid-trial *Franks* hearing, SA Nelson confirmed that, in drafting the search warrant and affidavit as it related to Lee's activities on August 31, 2021, she relied on her own observations of Lee as well as the surveillance report submitted to her by Task Force Officer ("TFO") Skaggs, who compiled this report from the various surveillance participants that day.[58] SA Nelson also confirmed that she did not view the aerial surveillance footage before drafting the search warrant and affidavit.[59]

### B.    The August 2021 Aerial Footage

The Government submitted the aerial footage in question, marked as Trial Exhibit 116 and 117, to the Court on July 18, 2023.[60] In Exhibit 116, the aerial footage begins by tracking Miller's gray sedan, which is parked in front of a townhouse in an Anchorage neighborhood. After approximately 52 minutes of surveillance of the parked sedan, an individual identified as Miller backs the sedan out of the driveway.[61] Miller first drives the sedan to a gas station convenience store, enters the store, and then returns to the vehicle.[62] Miller then continues driving, pulls into a

---

[56] *Id.*

[57] *Id.*

[58] Dkt. 169 at 21–22.

[59] *Id.* at 27–29. SA Nelson did concede that although she did "not see aerial surveillance specifically mentioned [in it] . . . one of [the FBI's] camera operators [was] listed as a participant, and so therefore [she] would [have been] aware that aerial surveillance was used that day." *Id.* at 30.

[60] *See* Dkt. 208.

[61] Exhibit 116 at 52:07.

[62] *Id.* at 57:00.

Walmart parking lot, drives around the lot, and leaves.[63] Miller then drives to the Arby's parking lot, parks, and walks to the Subject Vehicle driven by Lee.[64] The aerial camera then records Lee and Miller in the Arby's drive-thru, waiting behind at least four vehicles.[65] The recording ends with the Subject Vehicle still in the drive-thru line.

Exhibit 117 picks up where the previous exhibit ends, with the Subject Vehicle still waiting in the Arby's drive-thru. After waiting in a relatively long line of cars, the aerial camera records Lee exit the drive-thru early, pulling out from behind the vehicle in front of him before reaching the Arby's payment window and before receiving any food.[66] Lee drives the Subject Vehicle back to Miller's parked sedan, pausing in front of the sedan as Miller exits.[67] The aerial footage then captures Miller as he exits the Subject Vehicle, walks toward the driver's door of his sedan, pauses, and returns to the passenger side of the Subject Vehicle. Miller then opens the passenger door of the Subject Vehicle, appears to reach into the Subject Vehicle, and closes the passenger door and returns to the sedan.[68] Lee and Miller both drive out of the Arby's parking lot in their own vehicles; the aerial camera continues to follow Lee as he drives to the Walmart parking lot, back to his residence, to a Walgreens parking lot, and then, once again, back to his residence, as outlined in SA Nelson's affidavit.[69]

---

[63] *Id.* at 1:05:05–1:07:05.

[64] *Id.* at 1:09:00.

[65] *Id.* at 1:09:50.

[66] Exhibit 117 at 0:00–1:10.

[67] *Id.* at 1:30.

[68] *Id.* at 1:30–1:48.

[69] *Id.* at 2:00–55:00; Dkt. 23 at 25–28.

## IV.    LEGAL STANDARD

Rule 33 permits a "court [to] vacate any judgment and grant a new trial if the interest of justice so requires."[70] When deciding a motion for new trial, "[t]he court is not obliged to view the evidence in the light most favorable to the verdict, and it is free to weigh the evidence and evaluate for itself the credibility of the witnesses."[71] As a result, there may be circumstances where "despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred."[72] In these circumstances, the district court "may set aside the verdict, grant a new trial, and submit the issues for determination by another jury."[73] But such motions "should be granted 'only in exceptional cases in which the evidence preponderates heavily against the verdict.'"[74]

Newly discovered evidence may provide another basis on which a new trial is granted. In these instances, to prevail on a Rule 33 motion for a new trial a movant must satisfy a five-part test:

> (1) the evidence must be newly discovered;
> (2) the failure to discover the evidence sooner must not be the result of a lack of diligence on the defendant's part;
> (3) the evidence must be material to the issues at trial;
> (4) the evidence must be neither cumulative nor merely impeaching; and

---

[70] Fed. R. Crim. P. 33(a).

[71] *United States v. Kellington*, 217 F.3d 1084, 1097 (9th Cir. 2000) (quoting *United States v. Alston*, 974 F.2d 1206, 1211 (9th Cir. 1992)).

[72] *Id.* (quoting *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980)).

[73] *Id.* (quoting *Alston,* 974 F.2d at 1211).

[74] *United States v. Pimentel*, 654 F.2d 538, 545 (9th Cir. 1981) (quoting 2 CHARLES A. WRIGHT, FEDERAL PRACTICE AND PROCEDURE, Criminal § 553 at 487 (1969)).

(5) the evidence must indicate that a new trial would probably result in acquittal.[75]

There are exceptions to this general rule, however, such as in cases of *Brady* and *Giglio*[76] or other constitutional violations:

> A new trial is required where the prosecutor's failure to disclose was a considered decision for the sake of obstruction, or where the value of the evidence to the accused could not have escaped him. Where the non-disclosure is passive, i.e., not deliberate in the above senses, the courts have sometimes modified the criteria for a new trial, and instead looked to the defendant's harm, i.e., prejudice. Earlier decisions . . . have reasoned that where what is at stake is not deterrence of conduct detrimental to the integrity of the judicial system, the strong policy underlying the desired finality of judgments comes into play and requires a substantially higher probability that disclosure of the evidence to the defense would have altered the result.[77]

## V.     DISCUSSION

A. *The Aerial Footage Does Not Give Rise to a* Franks *Violation or Impact the Search Warrant's Probable Cause*

In the Motion, Lee alleges a new *Franks* violation, stating that SA Nelson included "false testimony in the affidavit" that "caused the evidence against Mr. Lee to be admitted at trial."[78]

Specifically, Lee takes issue with a portion of paragraph 59 of the affidavit, which states:

> The SUBJECT VEHICLE went through the drive thru before returning to where MILLER's vehicle was parked. MILLER then exited the SUBJECT VEHICLE, walked to his vehicle (the Chrysler 200) and grabbed a bag out of it. MILLER returned to the SUBJECT

---

[75] *United States v. Kulczyk*, 931 F.2d 542, 548 (9th Cir. 1991).

[76] *Giglio v. United States*, 405 U.S. 150 (1972).

[77] *United States v. Durgin*, 444 F.2d 308, 309 (9th Cir. 1971) (quoting *United States v. Polisi*, 416 F.2d 573, 577 (2d Cir. 1969)) (internal quotations omitted).

[78] Dkt. 205 at 4.

13

> VEHICLE with the bag and gave it to the driver of the SUBJECT
> VEHICLE (LEE) before returning to his vehicle and leaving.[79]

Lee maintains that newly discovered aerial footage directly contradicts this statement and "reveals that Miller never did hand [Lee] a bag—which [law enforcement] believed to hold drugs."[80] Lee concludes that because this purported bag exchange was "central" to the search warrant application, "without this false information, there was no basis for issuing the search warrant for [Lee's] residence."[81]

The Government disagrees, contending that the aerial footage actually corroborates SA Nelson's statements instead of establishing that she committed an intentional or reckless falsehood in her affidavit.[82] The Government appears to concede, however, that the "only surveillance observation that is not clearly shown in the video is [Miller] accessing the [sedan] to retrieve a bag" because he is boxed in by obstructions, including "the Tahoe, the Chrysler 200, a white sedan, and a row of trees."[83] Despite these visual barriers, the Government argues that:

> From the perspective of ground surveillance units observing at a
> distance with partially obstructed views, like Agent Nelson and TFO
> Skaggs, when [Miller] pauses by his vehicle and then returns to the
> Tahoe it was reasonable for law enforcement to conclude that
> [Miller] retrieved something from his vehicle.[84]

Consequently, the Government contends that while the search warrant affidavit's statement regarding the bag exchange was "perhaps mistaken," it was "not a deliberate or reckless

---

[79] Dkt. 23 at 26.

[80] Dkt. 205 at 4.

[81] *Id.*

[82] Dkt. 206 at 12.

[83] *Id.* at 17.

[84] *Id.*

Case 3:21-cr-00117-TMB-SAO   Document 211   Filed 08/17/23   Page 14 of 28

falsehood."[85] Furthermore, according to the Government, Miller's movements recorded by the aerial camera "are consistent with passing an object to the driver of the Tahoe."[86] The Government ultimately concludes that because Lee has not "established a deliberate or recklessly false statement, he cannot prevail on his post-trial *Franks* claim."[87]

A *Franks* inquiry is two-fold and examines whether the Magistrate Judge that issued a search warrant reached a probable cause determination that may have rested on false or misleading information.[88] If an affiant's "allegation of **perjury** or **reckless disregard** is established by the defendant by a preponderance of the evidence" at a *Franks* hearing, "and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit."[89]

1.  SA Nelson Did Not Make Intentionally or Recklessly Misleading Statements or Omissions

At the first step of a *Franks* inquiry, the defendant must show that the affiant intentionally or recklessly made false or misleading statements or omissions.[90] In the context of omissions, "[b]y reporting less than the total story, an affiant can manipulate the inferences a magistrate will draw."[91] To do so would "effectively usurp . . . the magistrate's duty to conduct an independent

---

[85] *Id.* at 18.

[86] *Id.*

[87] *Id.*

[88] *See Franks*, 438 U.S. at 155.

[89] *Id.* at 156 (emphasis added).

[90] *United States v. Perkins*, 850 F.3d 1109, 1116 (9th Cir. 2017).

[91] *United States v. Stanert*, 762 F.2d 775, 781 (9th Cir. 1985), *as amended by* 769 F.2d 1410 (9th Cir. 1985).

evaluation of probable cause."[92] However, an affiant's "negligent or innocent mistake does not warrant suppression" and thus does not constitute a *Franks* violation.[93]

Here, the discrepancies between paragraph 59 of the search warrant affidavit and the aerial footage do not demonstrate by a preponderance of the evidence that SA Nelson intentionally or recklessly made false or misleading statements or omissions. Notably, the Court has examined this search warrant affidavit on various prior occasions and has previously declined to find that SA Nelson committed any intentional or reckless falsity, and it again declines to do so here.[94]

The Court recognizes, however, that the affidavit's narrative outlining Miller and Lee's activities immediately after leaving the Arby's drive-thru does not precisely align with the aerial footage in one respect. The aerial footage shows Miller exit the Subject Vehicle, walk toward the driver's side of his sedan, pause, return to the Subject Vehicle, open the Subject Vehicle's passenger door, and shut the door before returning to his sedan. A reasonable interpretation of this footage could conclude that Miller exited the Subject Vehicle and upon reaching his vehicle, realized that he had forgotten something, only to return to the Subject Vehicle to either give or retrieve an item or mention one last thing to Lee. However, perhaps due to the recording's lack of visual clarity, it is not apparent that Miller had a bag in his hand when between the two vehicles.

Although there is an apparent discrepancy between paragraph 59 of the search warrant affidavit and the aerial footage, the Court cannot conclude that SA Nelson included this paragraph

---

[92] *Perkins*, 850 F.3d at 1118; *see also United States v. Johns*, 948 F.2d 1131, 1133 (9th Cir. 1988) (omitting facts that cast doubt on the existence of probable cause makes such omissions material); *United States v. Flores*, 679 F.2d 173, 177 n.1 (9th Cir. 1982) ("A magistrate cannot adequately determine the existence of probable cause with the requisite judicial neutrality and independence if the police provide him or her with a false, misleading, or partial statement of the relevant facts.").

[93] *Perkins*, 850 F.3d at 1116.

[94] *See, e.g.*, Dkt. 117; Dkt. 163; Dkt. 186.

16

either recklessly or intentionally. SA Nelson testified that at the time she drafted the affidavit, she had not reviewed the aerial footage, nor was she aware of anyone on her team that had reviewed it.[95] Instead, SA Nelson stated that she had primarily "relied on the 302 documentation" (other agent surveillance reports), her "own personal observations on surveillance," "discussions that [she] had with [her] team, and information that [their] analysts may have gathered as well."[96]

Based on this credible testimony, the Court is satisfied that SA Nelson did not review the aerial footage prior to drafting the search warrant affidavit and that there were multiple surveillance participants that observed Lee and Miller's movements on that day. It follows that there is no indication SA Nelson included paragraph 59 in an intentional or reckless fashion. Instead, it appears reasonable that, due to Miller and Lee's positioning, certain visual obstacles at the scene, and Miller's quick return to the Subject Vehicle, the on-the-ground surveillance participants reasonably inferred that Miller transferred an item to the Subject Vehicle. Yet, even if the Court were to assume that the bag exchange alleged in the search warrant were pure fiction, there is no indication that this falsity was anything but a mistaken observation made by the ground surveillance team, and an affiant's "negligent or innocent mistake does not warrant suppression."[97]

---

[95] Dkt. 169 at 13–38; *see also* Dkt. 186 at 4. SA Nelson conceded that although she did "not see aerial surveillance specifically mentioned [in it] . . . one of [the FBI's] camera operators [was] listed as a participant, and so therefore [she] would [have been] aware that aerial surveillance was used that day." Dkt. 169 at 30.

[96] Dkt. 169 at 21–22. Special Agent Nelson stated that she relied on a 302 report prepared by TFO Skaggs. *Id.* at 22–24, 29. This report was entered as a trial exhibit and used to verify SA Nelson's testimony. *See* Dkt. 168-1 (Skaggs 302 Report). SA Nelson also stated that it was "possible that TFO Skaggs had information in that 302 [report] that was relayed from the aerial surveillance that day," but that "she didn't know for sure" what materials he was relying on in drafting his 302 report. Dkt. 169 at 29–30, 35–36.

[97] *Perkins*, 850 F.3d at 1116.

2. <u>The Alleged False Statement or Omission Was Not Material to the Probable Cause Determination</u>

The second step in the *Franks* inquiry requires a defendant to show that the alleged false statement or omission was material, or in other words, necessary to the probable cause determination.[98] The "key inquiry is whether probable cause remains once the evidence presented to the magistrate judge is supplemented with the challenged omissions."[99] An omission or misstatement is material if it would "cast doubt on the existence of probable cause."[100] *Franks* instructs that the affiant must demonstrate that they are "truthful," and defines the term for the purposes of its inquiry:

> This does not mean "truthful" in the sense that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily. But surely it is to be "truthful" in the sense that the information put forth is believed or appropriately accepted by the affiant as true.[101]

First, the Court finds that the language in the paragraph regarding the bag exchange was not necessary to the Magistrate Judge's probable cause determination. Paragraph 59, as a whole, outlines Miller and Lee's behavior while at the Arby's drive-thru and parking lot, not merely during the alleged bag exchange. The paragraph ends with SA Nelson's conclusion of probable cause:

> Based on my training and experience, **this activity is consistent with narcotics trafficking, specifically while in the drive through, LEE and MILLER likely confirmed the amounts being**

---

[98] *Id.* at 1119.

[99] *Id.* (quoting *United States v. Ruiz*, 758 F.3d 1144, 1149 (9th Cir. 2014)).

[100] *Crowe v. County of San Diego*, 608 F.3d 406, 435 (9th Cir. 2010) (quoting *United States v. Garza*, 980 F.2d 546, 551 (9th Cir. 1992)).

[101] *Franks*, 438 U.S. at 164–65.

18

> **trafficked and the exchanged money.** Upon departure of the drive
> through, the narcotics were given to LEE by MILLER.[102]

If the Court were to strike just the disputed portion of paragraph 59, the rest of the interaction

between Lee and Miller at Arby's still provides sufficient probable cause to conclude that the two

men were participating in a narcotics transaction.

And even if the Court were to strike *the entirety* of paragraph 59, the search warrant

provided various other grounds comfortably supporting a finding of probable cause:

1. The extensive intercepted communication between McGranahan and Voss regarding the sale of narcotics;
2. Voss's communications with Miller immediately following and preceding his communications with McGranahan;
3. The intercepted communication between Miller and Lee coordinating a meeting;
4. The rendezvous between Miller and Lee in an Arby's drive-thru, where neither purchased any food after an extended wait in line at the drive-thru; and
5. Lee's activity in the Walgreens parking lot with an unknown driver, consistent with narcotics activities.

Because the Magistrate Judge could have found probable cause based on a combination of these

numerous other grounds, the disputed portion of paragraph 59 does not cast doubt on the search

warrant's validity.[103] Ultimately, even if these disputed portions were excised from the search

warrant, their absence would not have altered the affidavit's probable cause showing. Because any

misstatements in paragraph 59 were neither material, nor intentionally or recklessly made, the

Court finds that SA Nelson did not commit a *Franks* violation.

---

[102] Dkt. 23 at 26.

[103] Review of a Magistrate Judge's determination of probable cause should not take the form of *de novo* review but instead "should be paid great deference by reviewing courts." *Illinois v. Gates*, 462 U.S. 213, 236 (1983).

*B. The Disclosure Does Not Give Rise to a* Brady *or* Giglio *Violation*

Throughout the remainder of the Motion, Lee contends that the delayed disclosure of the additional aerial surveillance and the discrepancy between paragraph 59 and the aerial footage pose irreparable constitutional harms that warrant a new trial. Lee appears to present two arguments that the Government committed constitutional violations: (1) the Government deprived Lee of his constitutional rights under the Fifth and Sixth Amendments as interpreted in *Brady* and *Giglio*, and (2) the Government violated Lee's due process rights under the Fourteenth Amendment when it knowingly deceived the Court by presenting false evidence and "perjured testimony."[104]

In response, the Government contends that the disclosure of the aerial surveillance footage shortly before trial "did not violate [Lee's] Fifth or Sixth Amendment rights, because it would not have changed the outcome of the Court's pretrial rulings or the jury's verdict."[105] Moreover, the Government maintains that any harm to Lee was remedied when, mid-trial, the "Court took the extraordinary step of briefly continuing the trial to permit the reopening of the *Franks* hearing" so Lee could re-examine SA Nelson. Consequently, the Government disputes the argument that, were Lee to have had the additional aerial footage, the outcome of the *Franks* hearing would have been different.[106]

1. The Government's Delayed Disclosure Does Not Constitute a *Brady* Violation

As to Lee's first argument, the Court finds that the Government did not deprive Lee of his Fifth or Sixth Amendment rights when it disclosed the additional aerial footage a day before trial. In *Brady*, the Supreme Court held that "[t]he Fifth Amendment's Due Process Clause requires the

---

[104] *See generally* Dkt. 205.

[105] Dkt. 206 at 21.

[106] *Id.*

government to produce exculpatory information to the defense."[107] Exculpatory information "includes information that may be used to impeach prosecution witnesses."[108] To prove a *Brady* violation, the defense must prove three elements: "(1) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued."[109] "[S]trictly speaking, there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict."[110] "The prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial."[111]

The Court declines to find that the Government violated Lee's constitutional rights under *Brady* and its progeny for two reasons.[112] First, the Court recognizes that "[a] *Brady* violation does not exist if the newly discovered evidence is immaterial."[113] Here, the footage at issue closely mirrors the sequences of events provided in SA Nelson's search warrant affidavit and is not exculpatory. Had the aerial footage been produced earlier, its contents would not have altered the

---

[107] *See United States v. Mazzarella*, 784 F.3d 532, 538 (9th Cir. 2015) (citing *Brady*, 373 U.S. at 87).

[108] *Id.* at 538 (citing *Giglio*, 405 U.S. at 152–54).

[109] *United States v. Kohring*, 637 F.3d 895, 901 (9th Cir. 2011) (citing *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999)).

[110] *Greene,* 527 U.S. at 281.

[111] *United States v. Bagley*, 473 U.S. 667, 675–76 (1985).

[112] The Court previously considered a *Brady* and *Giglio* violation, as alleged by Lee, and incorporates its previous analysis therein. *See generally* Dkt. 163; Dkt. 186.

[113] *United States v. Ross*, 372 F.3d 1097, 1108 (9th Cir. 2004), *on reh'g in part*, 138 F. App'x 902 (9th Cir. 2005) (citing *Kyles v. Whitley*, 514 U.S. 419 (1995)).

jury's guilty verdicts. Although Lee raises the point that part of the description of events in paragraph 59 diverges from the aerial footage, as discussed previously, this discrepancy would not have warranted suppression of the evidence seized during the execution of the search warrant of the Subject Residence and Subject Vehicle. Consequently, the aerial footage does not present a reasonable probability that, had Lee had access to it earlier, the jury might have come to a different verdict.

Second, although the record shows that the Government inadvertently delayed disclosure of the additional aerial footage, any potential prejudice caused by this delay was mitigated by a 4-day mid-trial continuance and the reopening of the *Franks* hearing. Insofar as Lee argues that he was prejudiced because access to the additional aerial footage while litigating his motions to suppress would have resulted in suppression of all evidence against Lee, the Court disagrees and finds these allegations to be without merit. The aerial footage does not rise to the level of a *Franks* violation, nor does it degrade the probable cause of the search warrant. Any prejudice to Lee was addressed through the trial continuance and the Court's prohibition of the Government's use of the aerial footage. Because the aerial footage at issue would not have reasonably resulted in a different verdict, the Court rejects Lee's assertion that the Government committed a *Brady* violation.

2. The Government's Delayed Disclosure Does Not Constitute a *Giglio* Violation

The Court similarly declines to find that the Government committed a *Giglio* violation. In *Giglio*, the Supreme Court held that nondisclosure of material impeachment evidence warrants a

new trial when there is a reasonable likelihood of that evidence affecting the judgment of the jury.[114]

In Lee's case, however, *Giglio* is also inapplicable. Important to this consideration is that SA Nelson did not review the aerial footage before drafting the search warrant affidavit and had not reviewed it even after the Government provided it to Lee before trial.[115] The disputed narrative in paragraph 59 was instead gleaned from other surveillance participants and SA Nelson's own observations.[116] It thus follows that the aerial footage is not a valid mechanism for impeachment. Further, *Giglio* instructs that the Court is not "automatically" required to order "a new trial whenever a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict."[117] Because the Court has already determined that the discrepancy found in paragraph 59 of the search warrant affidavit would not have changed the verdict, the Court declines to grant a new trial on the basis of a *Giglio* violation.

### 3. The Government Did Not Violate Lee's Due Process Rights

Lee's second argument, that the Government violated his due process rights under the Fourteenth Amendment, similarly fails. Lee argues that "a conviction obtained through use of false evidence . . . must fall under the Fourteenth Amendment."[118] In support, Lee cites cases that discuss instances in which the Government *knowingly* introduced false evidence or testimony and then

---

[114] *See Giglio*, 405 U.S. at 153–55.

[115] Further, the record before the Court does not show any intentional or knowing deceit on the part of the Government. Dkt. 169 at 13–19, 27–28.

[116] *See generally id.* at 13–35.

[117] *Giglio*, 405 U.S. at 154.

[118] Dkt. 205 at 2.

*relied on that falsity* to achieve a conviction.[119] For example, Lee cites *Brown v. Borg*, a case in which the prosecutor failed to inform the defense of material exculpatory evidence in violation of *Brady* and failed to correct this false evidence throughout trial.[120] The Ninth Circuit held that a prosecutor's misconduct of knowingly introducing and relying on false evidence required the defendant's conviction be overturned, reasoning that "[t]he prejudice to a defendant's right to a fair trial is even more palpable when the prosecutor has not only withheld exculpatory evidence, but has knowingly introduced and argued false evidence."[121] The Ninth Circuit concluded that "[a] new trial is required 'if there is any reasonable likelihood that the false [evidence] could have affected the judgment of the jury.'"[122] Lee thereby argues that the Government's delayed disclosure of the aerial footage was knowing and thus so egregious that it warrants a new trial.[123]

The Court disagrees. Cases where the Government has knowingly withheld exculpatory evidence or knowingly relied upon false evidence so as to achieve a guilty verdict certainly are egregious instances in which the exceptional remedy of new trial is warranted. However, that is not the case here. There is no indication that in this case the Government either knowingly or intentionally introduced false evidence or testimony. Indeed, as discussed above, the Government's delayed disclosure appears to have been an unintentional mistake that the Court endeavored to remedy through a trial continuance, the re-opening of a *Franks* hearing, and an extended briefing

---

[119] *See* Dkt. 205 at 2–3 (citing *Napue v. People of State of Ill.*, 360 U.S. 264 (1959) (a conviction obtained through false testimony is a denial of due process)); *Chapman v. California*, 386 U.S. 18 (1966) (the prosecutor's comment on a defendant's decision not to testify during a criminal trial was not harmless error where the state failed to demonstrate beyond reasonable doubt that such comments did not contribute to the defendants' convictions).

[120] *Brown v. Borg*, 951 F.2d 1011 (9th Cir. 1991).

[121] *Id.* at 1015.

[122] *Id.*

[123] Dkt. 205 at 3.

schedule. Because the record in this case does not demonstrate that the Government knowingly presented false evidence so as to secure the search warrant at issue, or that the Government relied on the aerial footage at any point during trial, the Court cannot conclude that Lee's circumstances are akin to those in *Borg*, or that his due process rights under the Fourteenth Amendment have been violated so as grant a new trial.

### C. A New Trial is Not Warranted

Considering the foregoing, the Court finds this is not one of those "exceptional cases" in which the evidence presented at trial preponderates "sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred."[124] Further, there is no indication that this late-disclosed aerial footage, produced before the start of trial, necessarily constitutes newly discovered evidence that would require a new trial. And, as previously discussed, the aerial footage and the discrepancy with the search warrant affidavit are not material to the issues at trial, nor do they indicate that, had the footage been available to Lee before drafting his suppression motions, the trial would have resulted in acquittal.[125]

The Court finds that the Government did not violate Lee's constitutional rights under *Franks*, *Brady*, *Giglio*, or the Fourteenth Amendment. Relatedly, there is no indication that the search warrant affidavit lacks probable cause such that suppression of the fruits of the search of the Subject Vehicle and Subject Residence is warranted. The Court therefore concludes that a new trial is not required because the Government's failure to disclose was not "for the sake of

---

[124] *Pimentel*, 654 F.2d at 545 (quoting 2 CHARLES A. WRIGHT, FEDERAL PRACTICE AND PROCEDURE, Criminal § 553 at 487 (1969)); *Kellington*, 217 F.3d at 1095 (quoting *Lincoln*, 630 F.2d at 1319).

[125] *Kulczyk*, 931 F.2d at 548.

obstruction" or an occasion in which the "value of the evidence to the accused could not have escaped [the Government]."[126]

For these reasons, it would not be in the interest of justice for the Court to "set aside the verdict, grant a new trial, and submit the issues for determination by another jury."[127] Accordingly, the Court **DENIES** Lee's Motion for a New Trial.

### D. Dismissal of the Indictment is Not Warranted

Lee also moves the Court to dismiss his indictment with prejudice, contending that the Court may dismiss an indictment for a violation of due process or pursuant to its supervisory powers:[128]

> Dismissal of an indictment is warranted where outrageous law enforcement conduct violates due process . . . As with the power to dismiss an indictment for due process violations, supervisory powers do not flow from Rule 33. Supervisory powers are a means by which the federal courts fulfill their role in the criminal justice system: "Judicial supervision of the administration of criminal justice in the federal courts implies the duty of establishing and maintaining civilized standards of procedure and evidence."[129]

"To warrant dismissal on due process grounds, government conduct must be so grossly shocking and outrageous as to violate the universal sense of justice."[130]

As outlined in this Order, the Court finds that a new trial is not warranted because there is no indication of any "grossly shocking or outrageous" government conduct that might have

[126] *Durgin*, 444 F.2d at 309 (quoting *Polisi*, 416 F.2d at 577 (internal quotations omitted)).

[127] *Kellington*, 217 F.3d at 1095 (quoting *Alston,* 974 F.2d at 1211).

[128] *United States v. Barrera-Moreno,* 951 F.2d 1089, 1091 (9th Cir. 1991).

[129] *Ross*, 372 F.3d at 1107 (quoting *McNabb v. United States*, 318 U.S. 332, 340 (1943)).

[130] *United States v. Kearns*, 5 F.3d 1251, 1253 (9th Cir. 1993) (citing *United States v. Green,* 962 F.2d 938, 941 (9th Cir. 1992)).

violated any "universal sense of justice."[131] Just as a new trial is not warranted, the dismissal of Lee's indictment based on the Government's violation of his due process rights is not supported by the record in this case.

"[E]ven if the Government's conduct does not rise to the level of a due process violation, a court may nonetheless dismiss an indictment with prejudice under its supervisory powers" under three circumstances:[132] (1) to implement a remedy for the violation of a recognized statutory or constitutional right; (2) to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; and (3) to deter future illegal conduct."[133] However, the defendant must demonstrate prejudice before the Court may exercise its supervisory powers to dismiss an indictment.[134]

As previously discussed, the Court finds that Lee's due process rights have not been compromised, the jury's conviction rests on those considerations validly before it, and the Government did not engage in illegal conduct when it delayed the disclosure of the additional aerial footage. Relatedly, beyond Lee's broad allegations that the Government's late disclosure may have affected his defense strategy, Lee has failed to demonstrate prejudice warranting dismissal of his indictment. As a result, the Court **DENIES** Lee's Motion to Dismiss the Indictment with Prejudice.

---

[131] *Id.* at 1253 (9th Cir. 1993) (citing *Green,* 962 F.2d at 941).

[132] *United States v. Struckman*, 611 F.3d 560, 574 (9th Cir. 2010) (quoting *United States v. Chapman,* 524 F.3d 1073, 1084 (9th Cir. 2008) (internal quotations and brackets omitted)).

[133] *Id.* at 574 (quoting *United States v. Matta–Ballesteros,* 71 F.3d 754, 763 (9th Cir. 1995)) (affirming the district court's denial of defendant's motion to dismiss indictment as a way to remedy the Government's alleged *Brady* and *Giglio* violations).

[134] *Id.* at 574–75 (citing cases).

27

## VI.    CONCLUSION

For the foregoing reasons, Lee's Motion for New Trial and Motion to Dismiss Indictment at Docket 205 is **DENIED**.


IT IS SO ORDERED.


Dated at Anchorage, Alaska, this 17th day of August, 2023.

/s/  *Timothy M. Burgess*
TIMOTHY M. BURGESS
UNITED STATES DISTRICT JUDGE